UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545<br><br>Master Docket Case No. 1:14-cv-01748<br><br>Honorable Matthew F. Kennelly |
| WILLIAM J. BROUSSARD, SR., and ANNA BROUSSARD,<br><br>Plaintiffs,<br><br>vs.<br><br>ABBVIE INC.;<br>ABBOTT LABORATORIES, INC.; and ACTAVIS, INC.<br><br>Defendants. | COMPLAINT AND JURY DEMAND<br><br>Civil Action No. 1:15-cv-01006 |

## FIRST AMENDED COMPLAINT

Plaintiffs, WILLIAM J. BROUSSARD, SR. and ANNA BROUSSARD ("Plaintiffs"), residing in Iberia Parish, Louisiana, by and through their undersigned counsel, hereby sue Defendants AbbVie Inc., Abbott Laboratories, Inc., and Actavis, Inc. ("Defendants") and allege as follows:

## INTRODUCTION

1. This case involves the prescription drugs AndroGel and AndroDerm (collectively "Testosterone Drugs"), which are manufactured, sold, distributed and promoted by Defendants as testosterone replacement therapies.

2. Defendants misrepresented that Testosterone Drugs are safe and effective treatments for hypogonadism or "low testosterone," when in fact the drugs cause serious medical problems, including life threatening cardiac events, strokes, and thrombolytic events.

3. Testosterone Drugs cause the hematocrit level to increase, thereby thickening the blood. This effect, if not monitored and controlled properly, can lead to life threatening cardiac events, strokes and thrombolytic events.

4. Defendants failed to adequately warn physicians about the risks associated with Testosterone Drugs and the monitoring required to ensure the safety of patients using Testosterone Drugs.

5. Defendants engaged in aggressive, award-winning direct-to-consumer and physician marketing and advertising campaigns for Testosterone Drugs. Further, Defendants engaged in aggressive unbranded "disease awareness" campaigns to alert men that they might be suffering from "Low T."

6. As a result, diagnoses of Low T have increased exponentially. This has directly related to AndroGel's sales increasing to over $1.37 billion per year and reported AndroDerm sales of $87 million in 2011.

7. However, consumers of Testosterone Drugs were misled as to the drugs' safety and efficacy, and as a result have suffered injuries including life-threatening cardiac events, strokes, and thrombolytic events.

**PARTIES**

8. Plaintiffs are natural persons and citizens of the State of Louisiana.

9. Defendant AbbVie Inc. ("AbbVie") is a corporation organized and existing under the laws of Delaware with its principal place of business at 1 North Waukegan Road, North Chicago, Illinois 60064.

10. Defendant Abbott Laboratories, Inc. ("Abbott") is a corporation organized and existing under the laws of the state of Illinois and maintains its principal place of business at 100 Abbott Park Road, Abbott Park, Illinois 60064.

11. By way of background, Unimed Pharmaceuticals Inc. originally developed AndroGel and sought approval from the Food and Drug Administration ("FDA") in 1999. Before the drug was approved by the FDA in 2000, Solvay Pharmaceuticals Inc. acquired Unimed Pharmaceuticals, Inc. and subsequently brought AndroGel to market. In 2010, Abbott acquired Solvay's pharmaceutical division, which included AndroGel. Then, in 2013, Abbott created AbbVie, a company composed of Abbott's former proprietary pharmaceutical business, which included AndroGel.

12. Defendant Actavis, Inc. ("Actavis") is a corporation organized and existing under the laws of the state of New Jersey and maintains its principal place of business at 400 Interpace Parkway, Parsippany, New Jersey 07054.

13. By way of background, TheraTech, Inc. originally developed and sought FDA approval of AndroDerm in 1994. TheraTech was acquired by Watson Pharmaceuticals, Inc. ("Watson") in 1999, and AndroDerm with it. Watson acquired Actavis in 2012 and operated as Actavis thereafter.

14. At all times herein mentioned, Defendants, in interstate commerce and in this judicial district, advertised, promoted, supplied, and sold to distributors and retailers for resale to

physicians, hospitals, medical practitioners, and the general public certain pharmaceutical products, AndroGel and AndroDerm.

## JURISDICTION AND VENUE

15. This Court has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and because the amount in controversy between Plaintiff and Defendants exceeds $75,000, exclusive of interest and cost, and because, among other reasons, Defendants have significant contacts with this district by virtue of doing business within this judicial district.

16. Venue in this Court is proper pursuant to the order issued by the United States Judicial Panel on Multidistrict Litigation on June 6, 2014, establishing MDL No. 2545 consolidating for pre-trial purposes all cases involving injuries arising from the use of testosterone replacement therapies before the honorable Matthew F. Kennelly in the Northern District of Illinois.

## GENERAL ALLEGATIONS

17. This action is for damages brought on behalf of Plaintiff who was prescribed and supplied with, received and who has taken and applied the prescription drugs AndroGel and AndroDerm, as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants. This action seeks, among other relief, general and special damages and equitable relief in order to enable Plaintiff to treat and monitor the dangerous, severe and life-threatening side effects caused by these drugs.

18. Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiff's injuries and damages.

19. At all times herein mentioned, Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drugs AndroGel and AndroDerm for the use and application by Plaintiff.

20. At all times herein mentioned, Defendants were authorized to do business within the state of residence of Plaintiffs and in the state of Illinois.

21. At all times herein mentioned, the officers and directors of Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said products and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff herein.

22. Plaintiffs file this lawsuit within the applicable limitations period of first suspecting that said drugs caused the appreciable harm sustained by Plaintiff. Plaintiffs could not, by the exercise of reasonable diligence, have discovered the wrongful case of Plaintiff's injuries at an earlier time because the injuries were caused without perceptible trauma or harm, and when Plaintiff's injuries were discovered their cause was unknown to Plaintiffs. Plaintiffs did not suspect, nor did Plaintiffs have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable limitations period prior to the filing of this action. Additionally, Plaintiffs were prevented from discovering this information sooner because Defendants herein misrepresented

and continue to misrepresent to the public and to the medical profession that Testosterone Drugs are safe and free from serious side effects, and Defendants have fraudulently concealed facts and information that could have led Plaintiffs to discover a potential cause of action.

## OVERVIEW

23. Hypogonadism is a specific condition of the sex glands, which in men may involve the diminished production or nonproduction of testosterone.

24. In 1999, when Unimed Pharmaceuticals Inc., one of Abbott and AbbVie's predecessor companies, asked for FDA approval of AndroGel, it asserted that hypogonadism was estimated to affect approximately "one million American men."

25. In 2000, when the FDA approved AndroGel, Defendants announced that the market was "four to five million American men." By 2003, the number increased to "up to 20 million men." However, a study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001-2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue, and one quarter of men did not even have their testosterone levels tested before they received a testosterone prescription.

26. Defendants coordinated massive advertising campaigns designed to convince men that they suffered from low testosterone. Defendants orchestrated national disease awareness media blitzes that purported to educate male consumers about the signs of low testosterone. The marketing campaigns consisted of television advertisements, promotional literature placed in healthcare providers' offices and distributed to potential Testosterone Drugs users, and online media.

27. The television advertisements suggest that various symptoms often associated with other conditions may be caused by low testosterone and encourage men to discuss testosterone replacement therapy with their doctors if they experienced any of the "symptoms" of low testosterone. These "symptoms" include listlessness, increased body fat, and moodiness—all general symptoms that are often a result of aging, weight gain, or lifestyle, rather than low testosterone.

28. Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed, and that conditions associated with normal aging could be caused by low testosterone levels.

29. While running their disease awareness campaigns, Defendants promote Testosterone Drugs as easy to use topical testosterone replacement therapies. Defendants contrast their products' at-home topical application with less convenient prescription testosterone injections, which require frequent doctor visits.

30. Defendants convinced millions of men to discuss testosterone replacement therapy with their doctors, and consumers and their physicians relied on Defendants' promises of safety and ease. Although prescription testosterone replacement therapy had been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies.

31. What consumers received, however, were not safe drugs, but products which cause life-threatening problems, including strokes and heart attacks.

32. Defendants successfully created a robust and previously nonexistent market for their drugs.

33. Defendants' advertising paid off in a return of $1.4 billion in AndroGel sales during the past year, and over $87 million in sales of AndroDerm in 2011. Sales of replacement therapies have more than doubled since 2006, and are expected to triple to $5 billion by 2017, according to forecasts by Global Industry Analysts. Shannon Pettypiece, *Are Testosterone Drugs the Next Viagra?* (May 10, 2012), Bloomberg Businessweek, *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

34. Defendants' marketing programs sought to create the image and belief by consumers and physicians that low testosterone affected a large number of men in the United States and that Testosterone Drugs are safe for human use, even though Defendants knew these to be false, and even though Defendants had no reasonable grounds to believe them to be true.

35. There have been a number of studies suggesting that testosterone in men increases the risk of heart attacks and strokes.

36. In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group were suffered adverse events.

37. In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels" which indicated that testosterone therapy raised the risk of death, heart attack and stroke by about 30%.

38. On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a previous diagnosis of heart disease.

39. Two days later, on January 31, 2014, the FDA issued a Drug Safety Communication to physicians advising that the FDA was investigating the risk of stroke, heart attack and death in men using testosterone products based on the recent studies suggesting an increased risk of cardiovascular events among men using these products.

40. And on April 11, 2014, the European Medicines Agency announced that in light of the recent studies regarding the increased risk of cardiovascular events in patients using testosterone products, its Pharmacovigilance Risk Assessment Committee would be reviewing all data on the benefit-risk balance of testosterone-containing medicines to determine whether the marketing authorizations for these products should be maintained, varied, suspended or withdrawn across the European Union.

## FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

41. The FDA approved AndroGel 1% on February 28, 2000 for the treatment of adult males who have low or no testosterone. (AndroGel 1.62% was approved in April, 2011.) The FDA approved AndroDerm in September, 1995 for the treatment of adult males who have low or no testosterone. After FDA approval, Testosterone Drugs were widely advertised and marketed by Defendants as safe and effective testosterone replacement therapies.

42. AndroGel is a hydroalcoholic gel containing testosterone in either 1% or 1.62%, applied to the chest, arms or stomach and enters the body through transdermal absorption. The AndroGel 1.62% product also contains isopropyl myristate as an ointment and ethanol for absorption enhancement.

43. AndroDerm is a patch, which has a reservoir filled with a hydroalcoholic gel containing testosterone. When the patch is applied to the skin of the back, abdomen, upper arms, or thighs, testosterone from the gel in the reservoir is absorbed transdermally.

44. Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics.

45. The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

46. In men, testosterone levels normally begin a gradual decline after the age of thirty.

47. The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood. However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication. Resultantly, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

48. Testosterone Drugs may produce undesirable side effects to patients who use the drugs, including but not limited to, myocardial infarction, stroke, and death.

49. In some patient populations, use of Testosterone Drugs may increase the incidence of myocardial infarctions and death by over 500%.

50. In addition to the above, Testosterone Drugs have been linked to several severe and life changing medical disorders in both users and those who come into physical contact with users or the unwashed clothes of someone who applied Testosterone Drugs. Patients taking Testosterone Drugs may experience enlarged prostates and increased serum prostate-specific antigen levels.

51. Secondary exposure to Testosterone Drugs can cause side effects in others. In 2009 the FDA issued a black box warning for prescriptions for Testosterone Drugs, advising patients of reported virilization in children who were secondarily exposed to the gel.

Testosterone may also cause physical changes in women exposed to the drug and cause fetal damage with pregnant women who come into secondary contact with Testosterone Drugs.

52. Defendants' marketing strategy has been to aggressively market and sell their products by misleading potential users about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of its products.

53. Defendants successfully marketed Testosterone Drugs by undertaking "disease awareness" marketing campaigns. These campaigns sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low T."

54. Defendants' advertising programs sought to create the image and belief by consumers and their physicians that the use of Testosterone Drugs was a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew or should have known these to be false, and even though Defendants had no reasonable grounds to believe them to be true.

55. Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using Testosterone Drugs. Defendants deceived potential users of Testosterone Drugs by relaying positive information through the press, including testimonials from retired professional athletes, and manipulating hypogonadism statistics to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

56. Defendants concealed material relevant information from potential users of Testosterone Drugs and minimized user and prescriber concern regarding the safety of Testosterone Drugs.

57. In particular, in the warnings Defendants give in their commercials, online and print advertisements, Defendants fail to mention any potential cardiac or stroke side effects and falsely represents that Defendants adequately tested Testosterone Drugs for all likely side effects. Defendants also fail to warn and instruct regarding the importance of adequate monitoring of hematocrit levels.

58. As a result of Defendants' advertising and marketing, and representations about their products, men in the United States pervasively seek out prescriptions for Testosterone Drugs. If Plaintiff in this action had known the risks and dangers associated with Testosterone Drugs, Plaintiff would not have taken Testosterone Drugs and consequently would not have been subject to its serious side effects.

## SPECIFIC FACTUAL ALLEGATIONS

59. Plaintiff was prescribed AndroGel 1% and used it as directed from approximately February, 2009, to approximately September, 2009. Plaintiff was prescribed AndroDerm and used it as directed in or about February, 2012. Plaintiff was prescribed AndroGel 1.62% and used it as directed from approximately April, 2011 to approximately May, 2013.

60. Plaintiff was 55 years of age when he was prescribed and used testosterone for symptoms he attributed to low testosterone after viewing Defendants' advertisements.

61. Plaintiff was very healthy prior to taking testosterone. In keeping with his healthy and proactive lifestyle, Plaintiff agreed to initiate testosterone treatment. He relied on claims

made by Defendants that testosterone had been clinically shown to safely and effectively raise testosterone levels.

62. Plaintiff was diagnosed with coronary atherosclerosis on or about March 20, 2013, and with transient cerebral ischemia in or about May, 2013. As a result, for the rest of his life he must undergo regular testing, adhere to a restrictive diet, and take medication. Due to his coronary atherosclerosis and transient cerebral ischemia, he is now at markedly increased risk of additional cardiovascular disease, cerebrovascular accidents, and death.

63. Had Defendants properly disclosed the risks associated with testosterone, Plaintiff would have avoided the risk of coronary atherosclerosis and transient cerebral ischemia by either not using testosterone at all, severely limiting the dosage and length of use, and/or by closely monitoring the degree to which the drugs were adversely affecting his health.

64. As alleged herein, as a direct, proximate, and legal result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiff suffered severe and permanent physical and emotional injuries, including, but not limited to coronary atherosclerosis and transient cerebral ischemia. Plaintiff has endured pain and suffering, has suffered economic loss, including incurring significant expenses for medical care and treatment and will continue to incur such expenses in the future. Plaintiff seeks actual and punitive damages from Defendants as alleged herein.

## FIRST CAUSE OF ACTION
## STRICT LIABILITY – FAILURE TO WARN

65. Plaintiffs incorporate by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

66. The Testosterone Drugs manufactured and/or supplied by Defendants were defective due to inadequate warnings or instructions because Defendants knew or should have

known that the products created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks. The Testosterone Drugs manufactured and/or supplied by Defendants were defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should have known of the risk of serious bodily harm from the use of Testosterone Drugs, Defendants failed to provide adequate warnings to consumers and/or their health care providers of the product, knowing the products could cause serious injury.

67. As a direct and proximate result of Plaintiff's reasonably anticipated use of Testosterone Drugs as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

## SECOND CAUSE OF ACTION
## NEGLIGENCE

68. Plaintiffs incorporate by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

69. At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe and adequately warn of the risks and dangers of Testosterone Drugs.

70. At all times herein mentioned, Defendants negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold Testosterone Drugs and failed to adequately test and warn of the risks and dangers of Testosterone Drugs.

71. Despite the fact that Defendants knew or should have known that Testosterone Drugs caused unreasonable, dangerous side effects, Defendants continued to market Testosterone Drugs to consumers including Plaintiff, when there were safer alternative methods of treating loss of energy, libido erectile dysfunction, depression, loss of muscle mass and other conditions Defendants' advertising claims are caused by low testosterone.

72. Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

73. Defendants' negligence was a proximate cause of Plaintiff's injuries, harm and economic loss which Plaintiff suffered, and will continue to suffer, as described and prayed for herein.

**THIRD CAUSE OF ACTION**
**FOR BREACH OF IMPLIED WARRANTY**

74. Plaintiffs incorporate by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

75. Prior to the time that the aforementioned products were used by Plaintiff, Defendants impliedly warranted to Plaintiff and Plaintiff's agents and physicians that Testosterone Drugs were of merchantable quality and safe and fit for the use for which they were intended.

76. Plaintiff was and is unskilled in the research, design and manufacture of the products and reasonably relied entirely on the skill, judgment and implied warranty of Defendants in using Testosterone Drugs.

77. Testosterone Drugs were neither safe for their intended use nor of merchantable quality, as warranted by Defendants, in that Testosterone Drugs have dangerous propensities when used as intended and will cause severe injuries to users.

78. As a result of the abovementioned breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## FOURTH CAUSE OF ACTION
## FOR BREACH OF EXPRESS WARRANTY

79. Plaintiffs incorporate by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

80. At all times mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Testosterone Drugs are safe, effective, fit and proper for their intended use. Plaintiff purchased Testosterone Drugs relying upon these warranties.

81. In utilizing Testosterone Drugs, Plaintiff relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations were false in that Testosterone Drugs are unsafe and unfit for their intended uses.

82. As a result of the abovementioned breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## FIFTH CAUSE OF ACTION
## FRAUD

83. Plaintiffs incorporate by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

84. Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Testosterone Drugs, and up to the present, willfully deceived Plaintiff by concealing from them, Plaintiff's physicians and the general public, the true facts concerning Testosterone Drugs, which Defendants had a duty to disclose.

85. At all times herein mentioned, Defendants conducted sales and marketing campaigns to promote the sale of Testosterone Drugs and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the benefits, health risks and consequences of using Testosterone Drugs. Defendants knew of the foregoing, that Testosterone Drugs are not safe, fit and effective for human consumption, that using Testosterone Drugs is hazardous to health, and that Testosterone Drugs have a serious propensity to cause serious injuries to their users, including but not limited to the injuries Plaintiff suffered.

86. Defendants concealed and suppressed the true facts concerning Testosterone Drugs with the intent to defraud Plaintiff, in that Defendants knew that Plaintiff's physicians would not prescribe Testosterone Drugs, and Plaintiff would not have used Testosterone Drugs, if they were aware of the true facts concerning their dangers.

87. As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

## SIXTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

88. Plaintiffs incorporate by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

89. From the time Testosterone Drugs were first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but

not limited to the misrepresentation that Testosterone Drugs were safe, fit and effective for human consumption. At all times mentioned, Defendants conducted sales and marketing campaigns to promote the sale of Testosterone Drugs and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the health risks and consequences of the use of the abovementioned products.

90. Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject products.

91. The representations by Defendants were in fact false, in that Testosterone Drugs are not safe, fit and effective for human consumption, using Testosterone Drugs is hazardous to health, and Testosterone Drugs have a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

92. The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance and the prescription, purchase and use of Testosterone Drugs.

93. In reliance of the misrepresentations by Defendants, and each of them, Plaintiff was induced to purchase and use Testosterone Drugs. If Plaintiff had known of the true facts and the facts concealed by Defendants, Plaintiff would not have used Testosterone Drugs. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

94. As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

**SEVENTH CAUSE OF ACTION**
**ON BEHALF OF ANNA BROUSSARD**
**LOSS OF CONSORTIUM**

95. Plaintiffs incorporate by reference all preceding paragraphs of this Complaint as if fully set forth herein.

96. At all times hereinmentioned, Plaintiff ANNA BROUSSARD was the lawful spouse of Plaintiff WILLIAM J. BROUSSARD, SR.

97. As a direct and proximate result of the above-described conduct by Defendants and the injuries sustained by Plaintiff WILLIAM J. BROUSSARD, SR., Plaintiff ANNA BROUSSARD has suffered a loss of spousal consortium, companionship, society, affection, services and support.

**PUNITIVE DAMAGES ALLEGATIONS**

98. Plaintiffs incorporate by reference herein each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

99. The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights of Plaintiff and other users of Testosterone Drugs and for the primary purpose of increasing Defendants' profits from the sale and distribution of Testosterone Drugs. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

100. Prior to the manufacturing, sale, and distribution of Testosterone Drugs, Defendants knew that said medications were in a defective condition as previously described herein and knew that those who were prescribed the medications would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff and as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using Testosterone Drugs.

101. Despite their knowledge, Defendants, acting through their officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in Testosterone Drugs and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in Testosterone Drugs. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of Testosterone Drugs knowing these actions would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

102. Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment against Defendants as follows:

(a) For general damages in a sum in excess of the jurisdictional minimum of this Court;

(b) For medical, incidental, and hospital expenses according to proof;

(c) For pre-judgment and post-judgment interest as provided by law;

(d) For full refund of all purchase costs Plaintiff paid for testosterone;

(e) For compensatory damages in excess of the jurisdictional minimum of this Court;

(f) For consequential damages in excess of the jurisdictional minimum of this Court;

(g) For punitive damages in an amount in excess of any jurisdictional minimum of this Court and in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(h) For attorneys' fees, expenses, and costs of this action; and

(i) For such further relief as this Court deems necessary, just, and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury on all counts and as to all issues.

Dated: February 27, 2015

Respectfully submitted,

*/s/ Rachel Abrams*

Rachel Abrams (CA #209316)
**LEVIN SIMES LLP**
353 Sacramento Street, 20th Floor
San Francisco, CA 94111
Telephone: (415) 426-3000
Facsimile: (415) 426-3001
Email: rabrams@levinsimes.com
(Recently admitted to NDIL General Bar)